IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PATRICIA EGELHOFF,<br><br>        Plaintiff,<br><br>   v.<br><br>WYNDHAM RESORT DEVELOPMENT CORPORATION, a subsidiary of WYNDHAM VACATION OWNERSHIP,<br><br>        Defendant. | Case No. 2:11-cv-00007-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it defendant Wyndham's motion for summary judgment. The motion was argued on March 13, 2012, and the Court took it under advisement. For the reasons expressed below, the Court will grant in part and deny in part the motion.

## BACKGROUND

Defendant Wyndham, a seller of vacation ownership interests, hired plaintiff Egelhoff as a salesperson at its Coeur d'Alene, Idaho branch in 2004. Egelhoff was hired on an at-will basis and was paid solely on commissions earned from their sales.

Wyndham would begin its pitch with the "tour" – a process in which a potential customer would be greeted and screened in the lobby by intake personnel, escorted into an auditorium for a presentation of the product, and finally led into an office designated for the signing of a sales contract and transfer of payment. Salespersons were usually

assisted in this process by a member of management deemed a "closer," ostensibly for their talent in securing a sale after the initial pitch had been made.

Tours were assigned to specific salespersons on a rotating basis per the order set forth on the "board". At the beginning of each week, Wyndham's office manager would place the names of each salesperson on the board, ranking them on the basis of their sales performance the previous week, with the top performer in the top position. For each day of the week to follow, a salesperson who had made a sale the previous day would be moved to the top position -- if more than one salesperson had a sale that day, the salesperson with the highest sales volume would get the top spot. However, if a customer came into the store as a result of a referral from a prior sale, the salesperson responsible for that sale could jump to the front of the line in order to cater to that customer. The primary responsibility for administering the board in accordance with this procedure was vested in Pamela Allen, the office manager, but management had discretion to fix the board if mistakes were found.

Egelhoff worked under several different managers at various times during her tenure at the Coeur d'Alene office, but the overwhelming majority of her complaints are directed at two such individuals: Greg Patzold and Jeff Anderson. Patzold, at all times, was senior to Anderson, and promoted Anderson to management in 2008 after Anderson's return to the Coeur d'Alene store from another Wyndham branch located in Seattle. While employed at the Seattle branch, Anderson was the subject of an ethics complaint made to HR by a female co-worker.

The primary mechanism by which management tracked the performance of a salesperson was that person's "volume per guest" (VPG), which compared the total amount of income generated for a particular time period against the number of tours taken during that time. Thus, performance was a function not only of how skilled the salesperson was in their craft, but also of the number of tours taken and the "quality" or salability of the customers who came through the door. Generally, customers found by intake personnel to be financially ineligible to purchase the product were not taken on a tour; however, in certain cases, ineligible persons filtered through, although they effectively could not buy the product. Those tours, under Wyndham's policy, would not count against the relevant salesperson for purposes of their positioning on the board or in calculating their VPG.

Wyndham had an anti-discrimination policy in place, and a dedicated hotline for related complaints, from at least 2007. Egelhoff signed documents indicating her awareness of the policy and of the hotline. She used the hotline on two occasions, first in August of 2007, and again in April of 2009; each call occurred shortly after she had receiving unfavorable performance notifications from store management. On the first of these occasions, she had been given a written warning and placed on a "Performance Improvement Agreement" by Greg Patzold as a result of her unsatisfactory VPG for a period in 2007. On the second, she had been given a written warning by Jeff Anderson at the direction of Greg Patzold for making certain potentially misleading representations to a customer in the course of a solicitation.

The contents and scope of Egelhoff's complaints to HR following each of these incidents are disputed. It is undisputed, however, that at a minimum she complained of receiving inadequate training (in her first complaint in 2007) and that the procedures relating to the maintenance of the board were not being followed (in her second in 2009). Both complaints were investigated by Brian Whitaker, who worked in Wyndham's HR office, and he concluded in both investigations that there was no evidence of wrongdoing by the company or its managers.

On April 24, 2009, Egelhoff filed complaints citing discrimination and sexual harassment with the Idaho Human Rights Commission (IHRC) and the Equal Opportunity Employment Commission (EEOC). These complaints prompted a third investigation by Whitaker, from which he concluded that "most of Ms. Egelhoff's complaints were unsubstantiated and contradicted and she had not been subjected to sexual harassment or discrimination." *See Whitaker Declaration (Dkt. No. 29-02)* at pp. 3-4. However, Whitaker "did determine that the assistant sales manager, Jeff Anderson, had likely made some immature comments while at work [which did not rise] to the level of sexual harassment." *Id.* Whitaker recommended that Anderson be demoted from management. *Id*.

In August of 2009, a short time after Whitaker had completed this third investigation, Egelhoff informed him that she was transferring to Wyndham's Lake Tahoe branch. Although Egelhoff alleges the transfer resulted from the gender discrimination and sexual harassment complained of, she does not dispute Whitaker's

claim that she informed him at that time that the transfer was voluntary and unrelated to the substance of her EEOC and IHRC complaints.

In November of 2009, about three months after Egelhoff's transfer, the Coeur d'Alene branch was closed for economic reasons, and its employees were either transferred or lost their jobs. After her transfer to the Lake Tahoe branch, Egelhoff worked in various sales-related capacities until her employment with Wyndham terminated on February 18, 2011. Egelhoff does not complain of any misconduct by Wyndham or its employees towards her during this time, and essentially does not argue that the termination forms any part of her claims against Wyndham.

The heart of Egelhoff's complaint is that while she was employed in the Coeur d'Alene branch, her supervisors (initially, Greg Patzold, and subsequently both Patzold and Jeff Anderson) discriminated against, and sexually harassed, the female salespersons in an attempt to force them out and create an all-male sales staff. Egelhoff describes the following incidents of harassing conduct: (1) "Greg Patzold would call guys into his office to show naked pictures of his girlfriend [and would] come out and say things to [Plaintiff] like 'you should see the [sexual] positions," *see Pl.'s Ans. to Interrog. (Dkt. No. 29-7)* at p. 11; (2) Jeff Anderson would "walk around the sales floor and pretend he was mounting a girl and spanking her," *id.*; (3) Anderson would "lunge at [Plaintiff] and say things like 'what are you look'n at bimbo," *id.*; (4) Anderson perpetuated a running joke that Plaintiff could only make sales by taking off her jacket in order to reveal her figure, *id.* at p. 12; (5) Patzold once remarked after the Plaintiff put pictures out on her desk, that she "used to be pretty hot," *id.*; (6) Anderson would regularly "come back to

the sales table and point out a [female customer] and say, 'God I'd like to fuck her,' *id.*; (7) Anderson would inquire whether Plaintiff's breasts were real, *id.*; Anderson and Patzold would regularly comment on the physical attractiveness of girls passing by in their swimwear, *id.*; (8) Patzold would "have [Plaintiff] make lunch for all the [male] sales reps," *id.*; (9) Patzold and Anderson would "routinely take the guys out to strip clubs and bars, and then come in the next day and talk about, making comments like 'did you see the ass/tits/camel toes on that one,'" *id.* at 14.

Egelhoff also complains that Patzold and Anderson favored male salepersons by manipulating (or "kinking") the touring board. For example, Patzold and Anderson would allegedly "kink" the board by falsely designating certain customers as "referrals" credited to male sales staff, and by retaining male – but not female – sales staff in the top spot on the board when they toured ineligible customers. Even when female salespersons were able to get tours, Egelhoff alleges that Patzold and Anderson sabotaged her VPG – but not that of the male sales staff – by (1) denying their assistance as "closers" by reason of her gender; (2) counting ineligible customers against her for purposes of tour allocation and calculating VPG; (3) by artificially lowering her VPG by crediting her with tours she had not actually taken; (4) by stealing good customers and replacing them with ineligible ones; (5) by denying her extra preparatory time to complete sales; (6) by antagonizing her customers so that they would not purchase the product at all; and (7) by denying her access to the overflow queue and hence the opportunity to sell to those customers. Some of Egelhoff's allegations, particularly those concerning the kinking of the board, are corroborated by Monty Longmeier-Heffley, a female salesperson who

worked at the Coeur d'Alene branch during a significant portion of the time period in question.

Egelhoff further alleges that she complained about this behavior early and often, by making formal complaints to HR and informal complaints to Patzold and Anderson, and other management officials, including visiting corporate officials. Despite her complaints, she alleges, the discriminatory and harassing conduct continued.

Egelhoff's age discrimination claims appear to stem primarily from several discrete remarks allegedly made by Patzold and Anderson in reference to her age. She was over the age of 40 at all times while employed with Wyndham.

Finally, Egelhoff's assault and battery claims are apparently limited to Anderson and relate to at least two alleged incidents documented in the record, one in which Anderson nearly ran over Egelhoff in his truck, verbally threatening her as he did so, and another in which Anderson "lunged" at Egelhoff and threatened to burn down her house. In addition to these alleged incidents, Egelhoff alleges that Anderson is a "very violent person" who would come into work "with his knuckles bruised up and brag about beating somebody up" to his co-workers. *See Egelhoff Deposition (Dkt. No. 29-9)* at pp. 186-189.

Egelhoff filed this suit originally in state court, on December 10, 2010; Wyndham removed it here on January 5, 2011. Egelhoff's complaint contains state and federal causes of action for age and gender discrimination claims, negligent hiring and supervision, infliction of emotional distress, simple negligence, assault, and battery.

## ANALYSIS

## Summary Judgment Standard of Review

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001)(en banc). To carry this burden, for any issue on which the non-moving party bears the burden of proof at trial, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

**Bench Trial v. Jury Trial in the Summary Judgment Context**

While Wyndham recognizes that in the typical case, the Court may not adjudge credibility in a summary judgment proceeding, it argues that "[b]ecause Plaintiff has not requested a jury trial, the Court may weigh . . . and evaluate the evidence and reach a conclusion on the facts on the evidence presented." *See Wyndham's Brief (Dkt. No. 29-2)* at p. 19. This is true when a "more complete factual development could not possibly alter

the outcome and that the credibility of the witnesses' statements or testimony is not at issue." *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc*., 913 F.2d 676, 684 (9th Cir. 1990). That is not the case here, however. As will be discussed below, the resolution of most of the issues in this case depends largely on the credibility of witnesses. For example, Wyndham alleges that Egelhoff was given as many tours as the male sales staff, yet Egelhoff complains she was shortchanged and spent many days reading books at her desk. As another example, Wyndham describes Jeff Anderson's sexually charged conduct as isolated incidents directed at others while Egelhoff found them to be pervasive and designed to drive her out of the company. These and other credibility disputes prevent the Court from applying *TransWorld's* analysis here; instead, the Court will review this summary judgment motion under the *Celotex* standard, accepting as true Egelhoff's allegations and construing all inferences in her favor.

**Statute of Limitations**

Wyndham alleges that Egelhoff's gender discrimination claims are barred because she failed to file her claims with the EEOC and IHRC in a timely manner. The Court disagrees.

Egelhoff alleges a continuing course of discriminatory conduct by Patzold and Anderson dating at least from Patzold's return to the Coeur d'Alene branch in late 2007. Her gender discrimination claim is neither tied to nor dependent upon any discrete act, but rather alleges a long course of conduct. Where discrete acts of discrimination can reasonably be viewed as constituting the same "course of conduct," the statute of limitations does not begin to run until the conduct ceases. *Shelley v. Geren*, 666 F.3d

599, 606 (9th Cir. 2012). Because the conduct did not allegedly cease until Egelhoff's transfer in August of 2009, and Egelhoff filed her IHRC and EEOC complaints in April of 2009, this lawsuit is timely.

The Court also declines to grant summary judgment on Egelhoff's age discrimination claims on the basis that they are time-barred. Although these claims, unlike the gender-discrimination claims, *do* appear to be heavily dependent upon only a few discrete incidents, the record does not disclose when these incidents occurred. At trial, Wyndham will bear the burden of proving its statute of limitations defense. *See Payan v. Aramark Management Services Ltd. Partnership,* 495 F.3d 1119, 1122 (9th Cir. 2007) (holding in Title VII case that defendant bears burden of proving limitations defense). Consequently, Wyndham must, in this summary judgment proceeding, identify "specific facts" showing that the statute of limitations precludes this action, as a matter of law. *Celotex,* 477 U.S. at 324. Wyndham has not carried that burden.

## State and Federal Gender Discrimination Claims

Egelhoff alleges that Wyndham, through its agents Greg Patzold and Jeff Anderson, discriminated against her on the basis of her gender. She asserts three theories of liability under the state and federal anti-discrimination statutes in issue: (1) Wyndham intentionally allowed its agents (Patzold and Anderson), through numerous acts of sexual harassment, to create and maintain an environment hostile to women, including herself; (2) Wyndham knowingly allowing Patzold and Anderson to deny her tours by "kinking" the board; and (3) Wyndham unlawfully retaliated against her in response to her EEOC

and IHRC complaints by intentionally failing to prevent Patzold and Anderson from intensifying their discriminatory activities after she complained.

The Court further notes that although Egelhoff alleges she was effectively forced out of the Coeur d'Alene branch by the unlawful discrimination alleged in the Complaint, the Court construes this allegation as going to the damages and not as a distinct claim for "constructive discharge."  The Court reaches this conclusion because Egelhoff has not claimed that her eventual separation from Wyndham after her transfer to Lake Tahoe was caused by Defendant's wrongful conduct while she worked at Coeur d'Alene, and because she has not indicated that a distinct cause of action for "constructive transfer" exists, or what the appropriate legal standards might be if it does.  Therefore, the Court will decide this Motion by applying the above legal standards to the three causes of action listed previously, considering them to collectively constitute the whole of Plaintiff's gender discrimination claim.

### A. *Hostile Environment via Sexual Harassment*

Wyndham alleges that Egelhoff has failed to create any genuine issue of material fact concerning her sexual harassment claim.  The Court disagrees.

Wyndham argues that much of the sexually harassing conduct complained of by Egelhoff was not directed at her and thus cannot be used to support her claim.  That is not the law, however.  If "hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff." *McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1115, 1117-18 (9th Cir. 2004) (dealing with racial harassment); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10 (2002)

(holding that hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment). When a discriminatory animus "motivates a harasser to make provocative comments in the presence of an individual in order to anger and harass him, such comments are highly relevant in evaluating the creation of a hostile work environment, regardless of the identity of the person to whom the comments were superficially directed." *Id*. at 1118. Under this authority, the mere fact that sexually harassing conduct was directed at persons other than Egelhoff does not compel the Court to ignore that conduct. Egelhoff alleges that the conduct directed at others was actually designed to be seen by her and drive her out of the company. Taking these allegations to be true, they create issues of fact.

Wyndham characterizes these events as "isolated incidents" that if punishable would transform Title VII into a "civility code" in contravention of its purpose. Conduct violates Title VII if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 1113. The Supreme Court has followed a "middle path" with regard to the level of hostility or abuse necessary to establish a hostile work environment. *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21(1993). Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII. *McGinest,* 360 F.3d at 1113. It is enough, however, "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Id.* The Court evaluates the objective hostility from the perspective of a reasonable woman. *Id.* at 1115.

The Court need not determine at this stage whether the long list of sexually charged conduct set forth above actually occurred; the Court must accept the allegations as true and determine if they create genuine issues of material fact. Under that standard, the conduct described above happened on a regular, even daily, basis, contradicting Wyndham's characterization that it was "isolated." Moreover, the conduct was so sexually demeaning that any reasonable woman would have found it severely abusive and hostile. By Egelhoff's own testimony the conduct (1) made it more difficult for her to do her job, and (2) prompted her to leave. The Court therefore finds that summary judgment on these issues should be denied.

### B. *Direct Gender Discrimination via Kinking of the Board to Deny Tours*

Title VII, 42 U.S.C.A. § 2000e-2(a)(1), makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." Wyndham argues that the "kinking" of the board did not affect Egelhoff because the statistical sheets show that she received as many or more tours than her male co-workers. But this ignores Egelhoff's testimony that the sheets must be wrong because on many days, management "kinked" the board to give tours to the male sales staff and shortchange her, leaving her to sit at her desk with nothing to do but read books all day. A female co-worker, Monty Longmeier-Heffley, confirms that the board was frequently manipulated to favor certain male employees. *Longmeier-Heffley Depo.(Dkt. No. 36-5)* at pp.19-21. This testimony creates issues of fact over whether the manipulation of the board by management discriminated against Egelhoff because she was female.

C.  *Retaliation*

Egelhoff asserts that after she filed her EEOC and IHRC complaints alleging gender discrimination and sexual harassment, Wyndham retaliated against her by intentionally looking the other way while Patzold and Anderson intensified their discriminatory activities, particularly the kinking of the board.  She also refers to the alleged assaults committed by Anderson, described below, as instances of retaliation.  Finally, although she does not cite this portion of the record in support of its retaliation claim, she does allege that certain of her co-workers were instructed to disassociate themselves from her subsequent to the filing of her EEOC complaint.  *See Pl.'s Depo. (Dkt. No. 29-9)* at p. 142.  Wyndham argues in response that specific occurrences cited by Egelhoff do not constitute adverse employment decisions, and hence the retaliation claims fail as a matter of law.

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because he has made a charge [of discrimination under Title VII]". 42 U.S.C.A. § 2000e-3(a).  Retaliatory actions under this provision "are not limited to discriminatory actions that affect the terms and conditions of employment [but include] any employer action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Thompson v. North American Stainless, L.P.*, 131 S.Ct. 863, 868 (2011) (internal quotation marks and citations omitted).

The Court concludes that there are genuine disputes of material fact as to whether Wyndham retaliated against Egelhoff  "because of" her protected conduct.  42 U.S.C.A. § 2000e-3(a).  Here, it is undisputed that Egelhoff's EEOC and IHRC complaints

constituted protected conduct, and she alleges not only the continuation of practices that existed before these complaints were lodged, but also that these practices got markedly worse after she complained to the EEOC. *Pl.'s Depo. (Dkt. No. 29-9)* at pp. 240: 21-24, 141:23-142:25. Although the question is close, the Court also perceives a genuine issue as to whether Anderson's alleged assault against Egelhoff was foreseeable to Wyndham via its imputed knowledge of his violent temperament, such that Wyndham's failure to take reasonable measures to protect Egelhoff might constitute an intentional retaliatory act. Assuming, as we must, that Egelhoff's allegations regarding the retaliatory conduct are true, a reasonable person in her situation would be deterred by such conduct from making or pursuing a Title VII complaint. Hence, the Court will deny the motion for summary judgment on this issue.

**Age Discrimination in Employment Act (ADEA)**

Egelhoff abandoned her age discrimination claim by failing to even attempt to address Wyndham's specific attacks on this subject. The "party opposing summary judgment must direct [the Court's] attention to specific triable facts." Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003). The Court need not sift through the record and make the plaintiff's case for her. *Carmen,* 237 F.3d at 1029. For these reasons, the Court will grant summary judgment on the age discrimination claim.

**Negligent and Intentional Infliction of Emotional Distress**

From the discussion above, the Court has found questions of fact over whether Wyndham knowingly created a hostile work environment by ignoring Egelhoff's

complaints that Patzold and Anderson were harassing her – causing her emotional distress – to drive her out. These same questions of fact preclude summary judgment on her negligent infliction of emotional distress claim. She has conceded that she has no intentional infliction claim and the Court will order that claim dismissed.

**Negligence**

In its moving papers, Wyndham argued that this claim should be dismissed. Egelhoff did not respond and so waived the claim. It will be dismissed.

**Negligent Hiring and Supervision**

Egelhoff's claim is that Wyndham was negligent in supervising Anderson because it was foreseeable that Anderson would sexually harass and/or discriminate against her because of her gender or age.[1] She argues that the foreseeability of Anderson's discriminatory conduct is established by Wyndham's imputed knowledge that he had been the subject of an HR complaint while employed at Wyndham's Seattle, Washington branch prior to his transfer to Coeur d'Alene. As to the negligent hiring aspect of the claim, because she has never actually argued that Wyndham was negligent in Anderson's hiring, the Court will consider summary judgment on that portion of its claim to have been conceded.

The parties are in general agreement that a negligent supervision claim requires Egelhoff to demonstrate that an employer breached duties of care owed to third parties by virtue of the foreseeability of wrongful acts committed by its employee. *Doe v. Garcia*,

---

[1] Plaintiff does not tie Anderson's alleged violent acts towards her into her negligent supervision claim. Instead, her complaint is that Wyndham failed to discharge its duties of supervision with respect to the discriminatory actions of Anderson and Patzold. *Pl's. Resp.* at 11. Therefore, the Court's analysis of this claim is restricted accordingly.

**Memorandum Decision & Order — 17**

131 Idaho 578, 581 (1998). As Wyndham states in its opening brief, in Idaho such wrongful acts are foreseeable when they are "likely enough in the setting of modern life that a reasonably prudent person would take such into account in guiding reasonable conduct." *Id.*

As discussed above, if Egelhoff is to be believed, Anderson's violence and sexually-based aggression was displayed in the workplace on a regular basis, and observable to all, including Patzold, his supervisor. Given the severity of Anderson's conduct, there are at least questions of fact over whether it was foreseeable to Wyndham that he would sexually harass Egelhoff. Consequently, summary judgment on this claim will be denied.

**Assault and Battery**

Egelhoff has conceded to summary judgment on its battery claim, but argues that there is ample evidence of assault by Anderson. *Pl.'s Resp. (Dkt. No. 36)* at p. 12. Specifically, Egelhoff cites "several aggressive physical acts toward [Plaintiff]" and his "veiled threat[] to burn her house down." *Id.* The Court concludes that summary judgment on Plaintiff's assault claim is not warranted because the record contains direct testimony by Egelhoff that she was threatened by Anderson, acting in the course of his employment, with harm to both her person and property, and that she believed such threats would be carried out imminently. Moreover, Anderson's conduct would be threatening to a reasonable person, if Egelhoff's description of this conduct is true. Further, it can reasonably be inferred from the record that Anderson believed, however misguidedly, that by physically threatening Egelhoff he was serving his employer, by

contributing to the eventual realization of a superior all-male sales force. Moreover, the record contains sufficient factual allegations from which it could be inferred that Wyndham had actual or imputed knowledge of Anderson's violent temper, through its agent Greg Patzold, such that an assault arising from Plaintiff's EEOC complaint might be "expectable" by Wyndham. *Richard J. and Esther E. Wooley Trust v. DeBest Plumbing, Inc.*, 983 P.2d 834, 838 (Id.Sup.Ct. 1999) (when alleging vicarious liability for the intentional torts of an employee, in addition to the typical elements for a vicarious liability claim, Idaho law requires plaintiffs to prove that the use of force is not "unexpectable by the master"). Therefore, summary judgment for Wyndham is not warranted on the assault claim.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Wyndham's motion for summary judgment (docket No. 29) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks (1) dismissal of all claims of age discrimination, (2) dismissal of all claims sounding in battery; and (3) dismissal of the negligence claim in Count VI. It is denied in all other respects.

Date: **Apr 04, 2012**

B. LYNN WINMILL
Chief District Judge
United States District Court